1  JONATHAN D. WOLF, CA STATE BAR NO. 127043
   SUSAN E. BISHOP, CA STATE BAR NO. 187253
2  KATHLEEN F. SHERMAN, CA STATE BAR NO. 241200
   BERLINER COHEN, LLP
3  TEN ALMADEN BOULEVARD
   ELEVENTH FLOOR
4  SAN JOSE, CALIFORNIA 95113-2233
   TELEPHONE: (408) 286-5800
5  FACSIMILE: (408) 998-5388
   jonathan.wolf@berliner.com
6  susan.bishop@berliner.com
   kathleen.sherman@berliner.com
7

8  ATTORNEYS FOR PLAINTIFF
   CAPITAL MAILING SERVICES, INC.

9               UNITED STATES DISTRICT COURT

10              EASTERN DISTRICT OF CALIFORNIA

11                  SACRAMENTO DIVISION

| | |
|---|---|
| 12 CAPITAL MAILING SERVICES, INC., a California corporation, | CASE NO. _____ |
| 13 | COMPLAINT FOR: |
| 14          Plaintiff, | (1) COPYRIGHT INFRINGEMENT UNDER 17 U.S.C. § 106 |
| 15     v. | (2) MISAPPROPRIATION OF TRADE SECRETS UNDER CALIFORNIA CIVIL CODE §§ 3426 ET SEQ. |
| 16 SALT CREEK MEDIA, INC., a California corporation; ANDREW CODY, an individual; MATTHEW KELSOE, an individual; ROBERT RICO, an individual; JOSHUA BYRD, an individual; and DOES 1-20, | (3) VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT UNDER 18 U.S.C. § 1030(g) |
| 17 | (4) BREACH OF WRITTEN CONTRACT |
| 18          Defendants. | (5) BREACH OF FIDUCIARY DUTY |
| 19 | (6) BREACH OF DUTY OF LOYALTY |
| 20 | (7) UNFAIR COMPETITION UNDER SECTION 43(a) OF THE LANHAM ACT (15 U.S.C. § 1125(a)) |
| 21 | (8) UNFAIR COMPETITION UNDER CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200 ET SEQ. |
| 22 | |
| 23 | (9) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS |
| 24 | (10) PRELIMINARY AND PERMANENT INJUNCTION AND TEMPORARY RESTRAINING ORDER |
| 25 | |
| 26 | (JURY TRIAL DEMANDED) |

27

28

Plaintiff CAPITAL MAILING SERVICES, INC., ("CMS") alleges as follows:

## **PARTIES**

1.      Plaintiff CMS is, and at all relevant times was, a privately-held California corporation having its principal place of business in West Sacramento, California.

2.      CMS is informed and believes and on that basis alleges that DEFENDANT SALT CREEK MEDIA, INC., ("SALT CREEK") is, and at all relevant times was, a California corporation having its principal place of business in West Sacramento, California.

3.      Defendant ANDREW CODY ("CODY") at all relevant times until September 9, 2015 was an employee of CMS. CMS is informed and believes and on that basis alleges that CODY is, and at all relevant times was, an employee of and/or has an ownership interest in SALT CREEK. CMS is informed and believe that CODY is a citizen of the United States and a resident of the State of California, County of Sacramento.

4.      Defendant MATTHEW KELSOE at all relevant times until June 15, 2015 was an employee of CMS. CMS is informed and believes and on that basis alleges that KELSOE is, and at all relevant times was, an employee of and/or has an ownership interest in SALT CREEK. CMS is informed and believe that KELSOE is a citizen of the United States and a resident of the State of California, County of Sacramento.

5.      Defendant ROBERT RICO ("RICO") at all relevant times until June 15, 2015 was an employee of CMS. CMS is informed and believes and on that basis alleges that RICO is, and at all relevant times was, an employee of and/or has an ownership interest in SALT CREEK. CMS is informed and believe that RICO is a citizen of the United States and a resident of the State of California, County of Sacramento.

6.      Defendant JOSHUA BYRD ("BYRD") at all relevant times until June 17, 2015 was an employee of CMS. CMS is informed and believes and on that basis alleges that BYRD is, and at all relevant times was, an employee of and/or has an ownership interest in SALT CREEK. CMS is informed and believe that BYRD is a citizen of the United States and a resident of the State of California, County of El Dorado, County of Yolo, or County of Sacramento.

4850-9349-4824v4
KSHERMAN\22389003

**JURISDICTION AND VENUE**

7.     This is a civil action asserting claims for copyright infringement under 17 U.S.C. § 106, misappropriation of trade secrets under California Civil Code §§ 3426 *et seq.*, violations of the Computer Fraud and Abuse Act under 18 U.S.C § 1030(g), breach of written contract, breach of fiduciary duty, breach of duty of loyalty, unfair competition under Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)), unfair competition under California Business & Professions Code §§ 17200 *et seq.*, intentional interference with prospective economic relations, and preliminary and permanent injunction and temporary restraining order. This Court has subject matter jurisdiction over the federal claims asserted herein pursuant to 28 U.S.C. § 1331. This Court has subject matter jurisdiction over the non-federal claims asserted herein under 28 U.S.C. § 1367. This Court also has personal jurisdiction over all named Defendants.

8.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b), as it is the district within which all Defendants reside and all Defendants are residents of California, it is the district in which the conduct complained of arose, and it is the district in which all Defendants are subject to personal jurisdiction. Furthermore, KELSOE, RICO, and BYRD have contractually agreed to jurisdiction and venue in this district.

**INTRADISTRICT ASSIGNMENT**

9.     This action is filed in the Sacramento Division of the United States District Court, Eastern District of California. This intradistrict assignment is proper because all Defendants reside in Yolo County, Sacramento County, or El Dorado County, State of California. Furthermore, the alleged conduct occurred in Yolo County, State of California.

**GENERAL ALLEGATIONS**

10.     CMS is in the business of providing full-service print and mail services, and related marketing services. CMS provides four core services: sheet bed and forms printing, direct mail, presort commingling, and envelope manufacturing. Most relevant here is CMS's direct mail capability, which is discussed at length below. CMS's software division creates web-based applications that are used by both CMS and its customers to input, manage, and track the progress of customers' jobs. Customers are given logins to the CMS web applications (globally referred to as the

4850-9349-4824v4
KSHERMAN\22389003

"Job Board") so that they can check on the status of their jobs as well as to control certain aspects of the work. Typical customers are national marketing and advertising firms, as well as large corporations that handle their own marketing. The marriage of print and mail services with information technology solutions has afforded CMS enormous success.

11.     CMS was incorporated on January 28, 2008. In exchange for a small initial investment in CMS, CODY was issued 50,000 shares of stock, out of one million authorized shares. CODY was identified in corporate paperwork as President, CEO, CFO, and Treasurer, and Perice Sibley was identified as Secretary.

12.     On or about October 28, 2008, Hiram Sibley, the father of Perice Sibley, was issued 450,000 shares of CMS stock in exchange for a significant capital investment and line of credit. CODY made personal guarantees and pledged his CMS stock as collateral to Hiram Sibley to guarantee the performance of certain enumerated CMS obligations.

13.     On or about February 19, 2009, CODY sold all of his CMS stock to Hiram Sibley in exchange for valuable consideration. However, CODY retained his corporate titles and has continued to act as CMS's President until his termination on September 8, 2015.

14.     On or about March 11, 2009, Hiram Sibley transferred all of his CMS stock to APC Holding & Management, Inc., ("APC") a California S corporation, originally named "Partners, Print and Mail, Inc." All CMS stock is currently owned by APC.

15.     On or about December 26, 2012, KELSOE began his employment with CMS. At all relevant times, he was a supervising programmer. His job duties were to develop technology in support of CMS's products. On December 26, 2012, KELSOE entered into a written agreement with CMS titled "Capital Mailing Services, Inc. Confidential Employment and Invention Assignment Agreement." A true and correct copy of that written agreement, signed by KELSOE, is attached hereto as Exhibit 1. When KELSOE began his employment with CMS, he did not disclose any prior inventions, original works of authorship, developments, improvements, or trade secrets which were made by him prior to his employment with CMS that belong to him, that relate to CMS's proposed business, products, or research and development, and that KELSOE was not assigning to CMS. Under Section 3 of Exhibit 1, KELSOE agreed to, and did, assign to CMS all of his right, title, and

4850-9349-4824v4
KSHERMAN\22389003

interest in and to any and all inventions, original works of authorship, developments, improvements, and trade secrets made during his employment with CMS, except for those that qualified fully under the provisions of California Labor Code section 2870.

16.     On or about January 29, 2013, BYRD began his employment with CMS. At all relevant times, he was a programmer. His job duties were to develop technology in support of CMS's products. On January 29, 2013, BYRD entered into a written agreement with CMS titled "Capital Mailing Services, Inc. Confidential Employment and Invention Assignment Agreement." A true and correct copy of that written agreement, signed by BYRD, is attached hereto as Exhibit 2. When BYRD began his employment with CMS, he did not disclose any prior inventions, original works of authorship, developments, improvements, or trade secrets which were made by him prior to his employment with CMS that belong to him, that relate to CMS's proposed business, products, or research and development, and that BYRD was not assigning to CMS. Under Section 3 of Exhibit 2, BYRD agreed to, and did, assign to CMS all of his right, title, and interest in and to any and all inventions, original works of authorship, developments, improvements, and trade secrets made during his employment with CMS, except for those that qualified fully under the provisions of California Labor Code section 2870.

17.     On or about June 2, 2014, RICO began his employment with CMS. At all relevant times, he was a programmer. His job duties were to assist in the development of technology in support of CMS's products. On June 2, 2014, RICO entered into a written agreement with CMS titled "Capital Mailing Services, Inc. Confidential Employment and Invention Assignment Agreement." A true and correct copy of that written agreement, signed by RICO, is attached hereto as Exhibit 3. When RICO began his employment with CMS, he did not disclose any prior inventions, original works of authorship, developments, improvements, or trade secrets which were made by him prior to his employment with CMS that belong to him, that relate to CMS's proposed business, products, or research and development, and that RICO was not assigning to CMS. Under Section 3 of Exhibit 3, RICO agreed to, and did, assign to CMS all of his right, title, and interest in and to any and all inventions, original works of authorship, developments, improvements, and trade secrets made during his employment with CMS, except for those that qualified fully under the

4850-9349-4824v4
KSHERMAN\22389003

provisions of California Labor Code section 2870.

Development of PURL SYSTEM 2.0

18. CMS's direct mail capability includes a feature called "personal URLs." With this feature, CMS's customer provides to CMS a lead list it has purchased from a third party. CMS then loads the lead list into its Job Board system. Each direct mail piece from that customer is printed and mailed by CMS, and directs the prospect receiving the direct mail piece to access a URL (uniform resource locator, or web address) that is personalized not only to that specific prospect, but also to the specific mail piece to which the prospect responds. When a prospect responds to the direct mail piece by accessing the personal URL listed on it, the prospect logs in using an approval code contained in the direct mail piece. The prospect is then asked for his or her email address. The lead list information for that prospect is then displayed, and the prospect is asked to confirm the validity of the lead list information or to correct the information. The prospect is then asked further questions about his or her interest in CMS's customer's product or service. The result is a "validated contact" that is highly valuable to CMS's customer, both because the validated lead list information has a high degree of reliability and because the prospect has clearly signaled his or her interest in CMS's customer's product or service. This "validated contact" information is then emailed to CMS's customer, which then follows up with the prospect based on this validated contact information. Each personal URL contained in a direct mail piece originating from CMS on behalf of one of its customers is hosted by CMS, through third party service providers with which CMS contracts. The validated contact information (as well as the original lead list information) is also hosted by CMS through its third party contractors. CMS maintains this valuable information on behalf of its customers for further use by those customers. All of the customer data, in raw form as well as in validated form, is highly confidential information that is protected by passwords and other security measures. The ability of CMS to embed personal URLs in its direct mail pieces is very attractive to customers and highly lucrative to CMS.

19. CMS's personal URL software is embedded within its Job Board software. (For the sake of clarity, the personal URL software embedded within the Job Board software is referred to hereafter as "PURL SYSTEM 1.0.") As a result of years of experience with PURL SYSTEM 1.0,

4850-9349-4824v4
KSHERMAN\22389003

CMS identified a number of improvements that could be made to its personal URL software that would provide improved performance for CMS's customers and for the prospects responding to CMS's customers' direct mail pieces, and that would provide improved scalability and flexibility. With those goals in mind, CMS's technical staff, consisting primarily of KELSOE, RICO, and BYRD, undertook to implement a new personal URL software product (referred to hereafter as "PURL SYSTEM 2.0"). Two other programmers, one who is a current CMS employee and one who is a former CMS employee, provided minor programming assistance. Those two other programmers are not defendants in this action.

20. The PURL SYSTEM 2.0 source code was housed during its development by CMS in a repository hosted by GitHub, a third-party provider. CMS paid GitHub's monthly fees. The repository was password-protected. At all relevant times, KELSOE was the manager of that repository. The source code was highly confidential CMS information, and in order to protect that confidentiality, access to the source code was on a "need to know" basis only. Only KELSOE, RICO, BYRD, and approximately three other CMS programmers were given access to the source code.

The Formation of Salt Creek Media and the Theft of the PURL SYSTEM 2.0 Source Code

21. CMS is informed and believes and on that basis alleges that Defendants registered the "saltcreekmedia.com" domain on or about May 28, 2015. According to GoDaddy.com, the registrant was CODY. According to GoDaddy.com, the registrant's email address is "matt@capitalmail.net." That email address is KELSOE's CMS email address.

22. CMS is informed and believes and on that basis alleges that, on or about June 8, 2015, Defendants incorporated SALT CREEK in California.

23. In about May 2015, CODY informed CMS employees to take their orders from Perice Sibley and stopped coming to the CMS office. However, he did not resign. CMS is informed and believes and on that basis alleges that CODY repeatedly stated to third parties that he was sole shareholder of CMS and was therefore entitled to use CMS intellectual property for the benefit of his other businesses. CODY was terminated by CMS on or about September 8, 2015.

24. On or about June 12, 2015, KELSOE resigned from CMS, stating that he was leaving

4850-9349-4824v4
KSHERMAN\22389003

to work with CODY. RICO resigned from CMS on or about June 18, 2015. BYRD resigned from CMS on or about June 18, 2015. CMS is informed and believes and on that basis alleges that all three are now employed by SALT CREEK.

25. On or about June 18, 2015, the name of the GitHub source code repository containing the PURL SYSTEM 2.0 source code was changed from "Infotrackit[1]" to "Salt Creek Media" and all CMS employees were denied access to the source code repository. After CMS made repeated demands for access to the CMS source code repository, on or about July 1, 2015, Defendants gave access to the renamed "Salt Creek Media" GitHub source code repository to two CMS programmers. However, those programmers discovered that the PURL SYSTEM 2.0 source code had been removed from the repository. CMS made repeated demands that Defendants return the PURL SYSTEM 2.0 source code, but Defendants refused.

26. When KELSOE, BYRD, and RICO left CMS, PURL SYSTEM 2.0 was not yet fully operational. On or about July 15, 2015, CODY approached the only CMS programmer who had worked on PURL SYSTEM 2.0 who had not left CMS (referred to hereafter as "John Roe") and attempted to recruit John Roe for SALT CREEK. John Roe had provided only minor programming assistance on the PURL SYSTEM 2.0 project. CODY asked John Roe how long it would take him to recreate the work he had already done on PURL SYSTEM 2.0. CODY ultimately told John Roe that SALT CREEK would not hire him so that the formation of SALT CREEK and the hiring of KELSOE, BYRD, and RICO "would not look like a hostile move."

27. In mid-September 2015, CMS noticed that the SALT CREEK website was operational at saltcreekmedia.com. CMS noticed that the services offered by SALT CREEK were "Distributive Print Platform," "Purl Systems," and "Lead Management." CMS noticed that the links to "Distributive Print Platform" and "Lead Management" were not operational. However, the link to "Purl Systems" was operational. On the home page was a graphic purportedly showing the "Purl Management Platform" user interface. The graphic contained icons identical to the user interface for PURL SYSTEM 2.0, including the particular shade of blue used in the icons, the rounded corners,

---

[1] InfoTrack IT, Inc., is a California corporation that is wholly owned by APC, the corporation that also owns CMS.

4850-9349-4824v4
KSHERMAN\22389003

and the drawings within the icons. The "Terms of Service" link on the footer of each page at saltcreekmedia.com linked to the terms of service for InfoTrack IT, Inc., a California corporation that is wholly owned by APC, the corporation that also owns CMS.

28. Based on the aforementioned information, CMS initiated a further investigation as to whether Defendants had improperly copied and used the PURL SYSTEM 2.0 source code and trade secrets contained therein. CMS engaged a third party to conduct a forensic analysis of the three desktop computers used by KELSOE, BYRD, and RICO during their employment at CMS, which had been preserved by CMS following their departure. GitHub maintains a master copy of source code on its own servers, but always makes a shadow copy of the source code on the local computer of any programmer working on the source code. Thus, John Roe had a copy of the source code on his CMS desktop computer as it existed as of the last date he worked on the code on February 27, 2015. However, a forensic examination of the desktop computer of RICO, the main programmer for PURL SYSTEM 2.0, revealed no PURL SYSTEM 2.0 source code in the allocated (i.e. non-deleted) files therein. A further forensic examination of the desktop computer of RICO revealed PURL SYSTEM 2.0 source code in the non-allocated (deleted) files therein. This forensic examination supports the inference that RICO deleted the PURL SYSTEM 2.0 source code from his CMS desktop computer before his resignation, in an attempt to deprive CMS of access to that source code.

Theft of Other Source Code Developed by CMS

29. In addition to PURL SYSTEM 2.0, during their employment at CMS, KELSOE, BYRD, and RICO were also working on the development of a replacement for the Job Board software. Internally this project went by a number of different names, including "vendor management." The source code for this project was maintained in the CMS source code repository at GitHub described above. When Defendants gave access to the renamed "Salt Creek Media" GitHub source code repository to two CMS programmers on or about July 1, 2015, those programmers discovered that the vendor management source code had been removed from the repository in addition to the PURL SYSTEM 2.0 source code and other source code. CMS made repeated demands that Defendants return the vendor management source code, but Defendants refused.

30. In early November 2015, CMS noticed that a website hosted by SALT CREEK

4850-9349-4824v4
KSHERMAN\22389003

appears to offer a vendor management product. The SALT CREEK website also makes reference to a "Vendor Relations Management System." CMS is informed and believes that Defendants have copied CMS's vendor management source code and intend to use that as the basis for a SALT CREEK product. In addition, a website hosted by SALT CREEK appeared to be hosting a demo of CMS's vendor management software.

Theft of CMS Customers and Customer Data

31.     At all relevant times, the third party that CMS used to host Job Board data, including personal URLs, was Rackspace. In or about August 2014, KELSOE, using his CMS email address, set up an account with Codero, another third party that provides data hosting services. There would be no reason to set up an account with Codero, as CMS was satisfied with the services being provided by Rackspace. CMS is informed and believes that KELSOE set up the Codero account in anticipation of diverting CMS customers.

32.     From August 2014 until they left CMS in June 2015, both KELSOE and BYRD periodically communicated with Codero using their CMS email addresses regarding the account KELSOE had set up with Codero and CMS paid Codero's monthly fees.

33.     In May 2015, CMS began testing the PURL SYSTEM 2.0 product using live customer data of one customer, identified herein as CUSTOMER 1[2]. CMS is informed and believes that KELSOE set up CUSTOMER 1's personal URLs to be hosted at Codero, rather than Rackspace.

34.     In mid-September 2015, when CMS noticed that the SALT CREEK website was operational at saltcreekmedia.com, it also noticed that CUSTOMER 1's URL to which its May 2015 PURL SYSTEM 2.0's mailings related was being hosted by SALT CREEK.

35.     CUSTOMER 1 has purchased no additional personal URL services from CMS since May 2015. CMS is informed and believes that CUSTOMER 1 is now a SALT CREEK customer.

36.     CMS is informed and believes that KELSOE solicited CUSTOMER 2[3] in or about September 2015 by, among other things, touting the superiority of SALT CREEK's personal URL

---

[2] The true identity of CUSTOMER 1 will be revealed to Defendants upon request.

[3] The true identity of CUSTOMER 2 will be revealed to Defendants upon request.

4850-9349-4824v4
KSHERMAN\22389003

product as compared to CMS's PURL SYSTEM 1.0 and quoting a price that was lower than CMS's price. CUSTOMER 2 was a long-standing customer of CMS. Since then, CUSTOMER 2 has directed CMS to send multiple mailings with personal URLs hosted by SALT CREEK.

37. During his employment at CMS, CODY directed CMS employees to inform existing CMS customers that they should contact CMS through a phone number that happened to be associated with a cell phone owned by CODY. After CODY stopped coming into CMS in about May 2015, CMS is informed and believes that CODY continued to answer CMS calls on the cell phone associated with the CMS customer contact phone number. CMS directed CODY multiple times to release that phone number to CMS so that it could be transferred to a CMS phone. CODY has repeatedly refused to do so. CMS is aware of at least two CMS customers who have been solicited by CODY after they called the CMS customer contact phone number associated with CODY's cell phone. CMS is informed and believes that CODY continues to solicit CMS customer's through this phone number.

38. On or about November 5, 2015, CMS became aware that someone had logged into CMS's Job Board using the login of John Roe, deleted the data file associated with one of Customer 2's jobs, and made a status change to that job that allowed new data to be uploaded to that job. John Roe is not the individual who deleted the data file and made the status change to Customer 2's job. Prior to leaving CMS, KELSOE would have been able to obtain John Roe's login credentials. A forensic examination of the November 5, 2015 login event revealed that the person who was using John Roe's login had logged in from a proxy server in The Netherlands that camouflaged the actual IP address of the person who was using John Roe's login. CMS is informed and believes that the proxy server was used to conceal from CMS the fact that someone other than John Roe was using John Roe's login. Immediately after the status change was made to Customer 2's job on November 5, 2015, someone logged into CMS's Job Board using the credentials of the individual identified by Customer 2 as its agent (referred to hereafter as "Jane Smith"). The individual purporting to be "Jane Smith" logged in from the same IP address as that of SALT CREEK. CMS is informed and believes that Jane Smith was on vacation in the Bahamas on November 5, 2015 and that, therefore, one of the Defendants had logged in using Jane Smith's credentials. Once logged in, the person logged in as

"Jane Smith" uploaded a new data file to CMS's Customer 2 job from which the data file had been deleted a few moments earlier. The new data file added new personal URLs hosted by SALT CREEK.

39.    Upon becoming aware of this transaction, CMS immediately undertook an investigation of all Job Board logins that used the credentials of John Roe. CMS's Job Board has a feature called "mystiquing," through which authorized CMS personnel can log into the Job Board in such a way as to appear to the Job Board that they are logged in as another user. As mentioned earlier, CMS customers are given logins to the Job Board so that they can check on the status of their jobs as well as to control certain aspects of the work. The purpose of the "mystiquing" feature is to permit CMS personnel to perform these functions on behalf of customers upon request. Whenever anyone logs in using the "mystiquing" feature, that activity is reflected in an SQL log file. During its investigation, CMS discovered 12 events from mid-September 2015 to early November 2015 in which someone had logged in as "John Roe" from SALT CREEK's IP address using the "mystiquing" feature. John Roe is not the individual who logged in on these occasions from SALT CREEK's IP address. CMS also discovered one event on June 10, 2015, when KELSOE was still employed by CMS, when KELSOE logged into CMS's Job Board from SALT CREEK's IP address using his CMS credentials. (Those credentials were cancelled on or about June 15, 2015.) CMS also discovered five events, from June 19, 2015 through June 26, 2015, when CODY logged into CMS's Job Board from SALT CREEK's IP address using his CMS credentials. (Those credentials were cancelled on or about September 9, 2015.) As no data appears to have been changed during these logins, CMS is informed and believes that Defendants used John Roe's login credentials to gain the unauthorized access to CMS's Job Board, and that the purpose of that unauthorized access was to obtain proprietary, confidential, and trade secret CMS customer information, including but not limited to customer identities, contact information, job characteristics, job status information, pricing, and customer-provided data, in order to solicit and divert customers from CMS to SALT CREEK, with or without those customers' consent. As soon as the unauthorized use of John Roe's login credentials was discovered on November 5, 2015, CMS changed John Roe's login credentials.

40.    John Roe's credentials allow him to view all CMS Job Board data, whether he is

4850-9349-4824v4
KSHERMAN\22389003

logged in directly or by way of the "mystiquing" feature. Job Board logins that are not done by way of the "mystiquing" feature are not reflected in SQL log files. CMS is informed and believes that KELSOE, BYRD, RICO, and CODY are aware of these facts. Thus, CMS is informed and believes that Defendants used John Roe's login credentials through the "mystiquing" feature by mistake and, in fact, have logged into CMS's Job Board repeatedly using John Roe's credentials directly, without detection.

41. Based on the aforementioned facts, CMS is informed and believes that Defendants already have and will continue to solicit and divert customers from CMS to SALT CREEK and affiliated companies.

## **FIRST CAUSE OF ACTION**

[Copyright Infringement under 17 U.S.C. § 106 – against all Defendants]

42. CMS realleges, and incorporate herein by reference, the allegations of paragraphs 1 through 41.

43. The PURL SYSTEM 2.0 source code contains a substantial amount of material wholly original with CMS and that constitutes copyrightable subject matter under the laws of the United States. CMS has complied with the Copyright Act, 17 U.S.C. § 101 et seq. and all other laws governing copyright regarding the PURL SYSTEM 2.0 source code. The PURL SYSTEM 2.0 source code is fixed in tangible mediums of expression.

44. Pursuant to the "Capital Mailing Services, Inc. Confidential Employment and Invention Assignment Agreement" signed by KELSOE, BYRD, RICO, and each of the current and former CMS programmers that worked on the development of the PURL SYSTEM 2.0 source code, CMS is sole owner of all of rights, title, and interest in and to the PURL SYSTEM 2.0 source code.

45. Pursuant to 17 U.S.C. § 411, CMS sought and obtained a copyright registration in the original portions of the PURL SYSTEM 2.0 source code as it existed on February 27, 2015. That Registration Number is TXu 1-960-549, effective October 8, 2015. A true and correct copy of that registration is attached hereto as Exhibit 4. CMS intends to obtain a copy of the PURL SYSTEM 2.0 source code as it existed at the time Defendants deprived CMS access to the GitHub source code repository, register the copyright in that source code, and amend this Complaint to identify that new

4850-9349-4824v4
KSHERMAN\22389003

Registration Number.

46. Based on the removal of the PURL SYSTEM 2.0 source code from the GitHub source code repository between about June 18, 2015 and July 1, 2015 and Defendants' refusal to restore that source code to the repository, CMS is informed and believes and on that basis alleges that Defendants copied that source code to another location. This copying was not authorized by CMS and therefore constitutes copyright infringement under 17 U.S.C. § 106.

47. Based on the facts alleged above, CMS is informed and believes and on that basis alleges that Defendants developed a personal URL software product that is substantially similar to PURL SYSTEM 2.0 in its original portions, which constitutes copyright infringement under 17 U.S.C. § 106.

48. Based on the facts alleged above, CMS is informed and believes and on that basis alleges that Defendants actually copied the PURL SYSTEM 2.0 source code, and that SALT CREEK's personal URL software product is an extension or modification of the PURL SYSTEM 2.0 source code and therefore constitutes copyright infringement under 17 U.S.C. § 106.

49. Based on the facts alleged above, Defendants' past and ongoing infringement of CMS's copyright is and was willful.

50. CMS is informed and believes and on that basis alleges that the foregoing conduct by Defendants was done willfully, wantonly, in bad faith and with knowledge of the fact that the PURL SYSTEM 2.0 source code is protected by federal copyright law and is owned by CMS.

51. The natural, probable, and foreseeable result of the aforesaid conduct of Defendants has been and will continue to be to deprive CMS of the value of PURL SYSTEM 2.0 to its own product line, to deprive CMS of goodwill, to injure CMS's relations with existing and prospective customers, and to impose substantial expenses on CMS to counteract the aforesaid conduct.

52. As a proximate result of Defendants' actions, CMS has been harmed. CMS is entitled to recover from Defendants the damages it has sustained and will sustain because of Defendants' wrongful acts as alleged above. CMS is further entitled to recover from Defendants the gains, profits, and advantages, without any deduction for overhead expenses, that SALT CREEK has obtained because of Defendants' wrongful acts as alleged above. CMS is further entitled to recover

4850-9349-4824v4
KSHERMAN\22389003

1  from Defendants statutory damages for willful infringement.

2      53.    CMS is entitled to preliminary and permanent injunctions restraining Defendants and

3  SALT CREEK's officers, agents, and employees, and all persons acting in concert with Defendants,

4  from engaging in further such acts in violation of the copyright laws.

5  **SECOND CAUSE OF ACTION**

6  [Misappropriation of Trade Secrets under

7  California Civil Code §§ 3426 *et seq.* – against all Defendants]

8      54.    CMS realleges, and incorporates herein by reference, the allegations of paragraphs 1

9  through 53.

10      55.    The PURL SYSTEM 2.0 source code, both the original portion and the original

11  portion in combination with the incorporated open source code, as well as the vendor management

12  source code, constitutes and contains a number of trade secrets, which derive independent economic

13  value from not being generally known to the public or to other persons who can obtain economic

14  value from its disclosure or use. In addition, CMS's customer information, including but not limited

15  to customer identities, contact information, job characteristics, job status information, pricing, and

16  customer-provided data, accessible through CMS's Job Board, constitutes and contains a number of

17  trade secrets, which derive independent economic value from not being generally known to the

18  public or to other persons who can obtain economic value from its disclosure or use.

19      56.    CMS has made reasonable efforts under the circumstances to maintain the secrecy of

20  its trade secrets. These efforts include, but are not limited, to the following: At all relevant times,

21  every CMS employee was required to sign a "Capital Mailing Services, Inc. Confidential

22  Employment and Invention Assignment Agreement," the same agreements signed by KELSOE,

23  BYRD, and RICO, when they joined CMS. A blank copy of that agreement is attached hereto as

24  Exhibit 5. At all relevant times, every computer used by a CMS employee was password-protected.

25  At all relevant times, every visitor to CMS was required to sign a "Facility Admittance &

26  Confidentiality Agreement." A blank copy of that agreement is attached hereto as Exhibit 6. At all

27  relevant times, every visitor to CMS was required to wear a name badge. A blank page of CMS

28  visitor name badges is attached hereto as Exhibit 7. At all relevant times, there were "Employees

Only" signs at all entrances to the factory floor. At all relevant times, all employees on the factory floor were required to wear CMS t-shirts. Thus, the presence of any non-employees on the factory floor was immediately apparent, and those persons could be questioned if their reason for being present was not known. At all relevant times, the source code repository for PURL SYSTEM 2.0 was protected by a password. In addition, the repository had a single administrator, KELSOE, during the time CODY, KELSOE, BYRD, and RICO were employed at CMS. Only programmers specifically invited to the repository by KELSOE could gain access to it. At all relevant times, CMS's policy was that access to the source code was on a "need to know" basis only. At all relevant times, CMS's Job Board data was hosted by Rackspace, and was protected by passwords. Only three CMS employees were provided with the passwords giving them full access to that data. During his employment at CMS, BYRD was one of those employees. At all relevant times, CMS controlled access to its network, giving employees access to isolated areas of the network only, depending on their job function. During his employment at CMS, BYRD controlled access to the network. Among the employees who were provided limited access to the network was John Roe, one of the CMS employees who worked on PURL SYSTEM 2.0. At all relevant times, the number of CMS employees with offsite access to CMS's network was extremely limited. During their employment, KELSOE, BYRD, and CODY were among the few CMS employees who had offsite access to CMS's network. At all relevant times, CMS's customers had access to CMS's Job Board, but only to their own data.

57.     In addition to CMS's Confidential Information and Invention Assignment Agreement, CODY issued and KELSOE, RICO, and BYRD acknowledged receipt of CMS's Employee Handbook ("Handbook"), which further spelled out their obligations to CMS. Among other provisions, the Handbook required the disclosure of actual or potential conflicts of interest; prohibited taking or destroying CMS property; prohibited the disclosure of confidential, proprietary, or trade secret information of CMS, its customers, or its vendors; prohibited "moonlighting" that created a conflict of interest; provided that software developed by CMS employees or contract personnel on behalf of CMS is the property of CMS; provided that employees are not permitted to engage in activities that compete or conflict with CMS; provided that any inventions during work

4850-9349-4824v4
KSHERMAN\22389003

hours or using CMS's equipment or facilities are the property of CMS; and provided that any employees wishing to develop an invention that relates to a CMS product or service must obtain a written waiver. Furthermore, the Handbook included a section regarding trade secrets reading as follows:

> The trade secrets and confidential information of Capital Mailing Services are its lifeblood. As a condition of employment, Company employees are required to protect the confidentiality of Company trade secrets and confidential information. Employees may come into contact with customer lists, operational or manufacturing procedures, or other confidential information. Access to this information should be limited to a "need to know" basis and should not be used for personal benefit, disclosed, or released, without prior authorization from a supervisor.

> Any employee who has information that leads them to suspect that an employee or competitor is obtaining the Company's confidential information is required to inform their supervisor of such.

> Unauthorized disclosure of trade secrets, or other confidential information, may result in the discipline or termination of any employee, as well as subject the employee to potential legal action. Employee agrees not to disclose or communicate, in any manner, directly or indirectly, information about Capital Mailing Services Inc., its operations, clientele, or any other information, that relates to the business of the Company, including, but not limited to, the names of its customers or clients, its marketing strategies, operations, or any other information of any kind which would be deemed confidential, a trade secret, a customer or client list, or other form of proprietary information of Capital Mailing Services Inc. Employee acknowledges that the above information is material and confidential and that it affects the profitability of the Company. To the extent employee believes they need to disclose confidential information, they may do so only after obtaining prior written authorization from their supervisor. Employee understands any breach of this provision, or of any other confidentiality and non disclosure obligation, is a material breach of the terms of their employment.

58. Pursuant to Exhibits 1, 2, and 3, the Handbook, and applicable law, Defendants were, and remain, under a duty both to keep CMS's confidential, proprietary, and trade secret information secret, and not to use or disclose such information other than for the benefit of CMS and with CMS's authorization.

59. Defendants misappropriated CMS's trade secrets through the unauthorized taking and use of CMS's trade secret information, as alleged above.

60. Defendants' actual and threatened misappropriation of CMS's trade secrets, unless

4850-9349-4824v4
KSHERMAN\22389003

and until enjoined and restrained by order of this Court, is causing and will continue to cause great and irreparable harm to CMS. CMS is threatened with losing its intellectual property as well as current and potential business. CMS has no adequate remedy at law for the injuries currently being suffered and the additional injuries that are threatened, because it would be impossible to quantify in dollars the losses described above when this matter is finally adjudicated, and Defendants will continue to engage in their wrongful conduct and CMS will continue to suffer irreparable injury that cannot be adequately remedied at law unless Defendants are enjoined from engaging in any further such acts of misappropriation.

61. As a direct and proximate cause of Defendants' misappropriation of CMS trade secrets, Defendants have been unjustly enriched in an amount to be ascertained at trial, and CMS has sustained, and will continue to sustain, actual damages in an amount to be determined according to proof. CMS has also suffered irreparable harm as a result of Defendants' actions.

62. Defendants are entitled to an award of attorneys' fees.

63. In performing the acts alleged above, Defendants acted intentionally, fraudulently, and maliciously, and with the deliberate intent to injure CMS's business and improve their own business and for financial gain, thereby warranting an award of exemplary damages in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct.

## THIRD CAUSE OF ACTION

[Violations of the Computer Fraud and Abuse Act under

18 U.S.C. § 1030(g) – against all Defendants]

64. CMS realleges, and incorporates herein by reference, the allegations of paragraphs 1 through 63.

65. Defendants' conduct, as set forth above, violated 18 U.S.C. § 1030 in that Defendants intentionally, beginning twelve months prior to the date of this pleading up to and including the date of this pleading, accessed the protected computer on which CMS's GitHub source code repository was stored, without authorization by CMS or in excess of CMS's authorization, and by means of such conduct, unlawfully obtained CMS's source code stored on that repository.

66. Defendants' conduct, as set forth above, additionally violated 18 U.S.C. § 1030 in

4850-9349-4824v4
KSHERMAN\22389003

that Defendants intentionally, beginning twelve months prior to the date of this pleading up to and including the date of this pleading, accessed the protected computer on which CMS's Job Board data is stored, without authorization by CMS or in excess of CMS's authorization, and by means of such conduct, obtained CMS's proprietary, confidential, and trade secret CMS customer information, including but not limited to customer identities, contact information, job characteristics, job status information, pricing, and customer-provided data, for the purpose of soliciting and diverting CMS's customers to SALT CREEK.

67. Defendants are informed and believe that the computer on which CMS's GitHub source code repository was stored was used in or affected interstate or foreign commerce or communication.

68. The computer on which CMS's Job Board data is stored is used in or affects interstate or foreign commerce or communication.

69. As a direct and proximate result of Defendants' conduct as alleged above, CMS has suffered actual damages in an amount to be determined according to proof, but aggregating at least $5,000 in value.

## FOURTH CAUSE OF ACTION

[Breach of Written Contract – against KELSOE, RICO, and BYRD]

70. CMS realleges, and incorporates herein by reference, the allegations of paragraphs 1 through 69.

71. As a condition of their employment with CMS, KELSOE, RICO, and BYRD executed CMS's Confidential Information and Invention Assignment Agreement, an unsigned copy of which is attached hereto as Exhibit 4, and executed copies of which are attached hereto as Exhibit 1 (KELSOE), Exhibit 2 (BYRD), and Exhibit 3 (RICO) (collectively "Agreements").

72. The Agreements constitute valid, binding, and enforceable contracts that required KELSOE, RICO, and BYRD during the period of their employment with CMS, and after cessation of employment for any reason, not to use or disclose any Confidential Information (as defined in Exhibits 1, 2, 3, and 5) of CMS or its clients; not to use or disclose any Proprietary Information (as defined in Exhibits 1, 2, 3, and 5) of CMS and not to use any such information to solicit CMS

4850-9349-4824v4
KSHERMAN\22389003

customers; not to use or disclose any Protected Information (as defined in Exhibits 1, 2, 3, and 5) of CMS's employees, clients, suppliers, vendors, or other persons that became known to them as a result of their employment with CMS; not to use or disclose any Third Party Information (as defined in Exhibits 1, 2, 3, and 5) of CMS's clients, affiliated companies, and subsidiaries; and to promptly inform CMS of the disclosure of any Confidential Information upon discovery.

73. The Agreements also required KELSOE, RICO, and BYRD not to "directly or indirectly engage or undertake any planning, employment, occupation, consulting, or other business activities" that are in competition with CMS.

74. The Agreements also required KELSOE, RICO, and BYRD to return all CMS documents to CMS when leaving CMS's employ, and not to retain any tangible or intangible copies of any confidential information of CMS or its clients.

75. CMS has performed, or was excused from performing, all of its obligations under the Agreements.

76. KELSOE, RICO, and BYRD, and each of them, breached their contractual obligations to CMS as alleged above.

77. As a direct and proximate result of KELSOE, RICO, and BYRD's breaches of contract, CMS has suffered, and will continue to suffer, actual damages in an amount to be determined according to proof. CMS seeks compensation for all damages and losses directly and proximately caused by these breaches.

## FIFTH CAUSE OF ACTION

[Breach of Fiduciary Duty – against CODY]

78. CMS realleges, and incorporates herein by reference, the allegations of paragraphs 1 through 77.

79. As President, CEO, CFO, and Treasurer of CMS, CODY had a fiduciary duty to act with the utmost good faith in the best interests of CMS. CODY owed CMS the fiduciary duties of reasonable care, of undivided loyalty, and of confidentiality.

80. In performing the acts alleged above, CODY failed to act as a reasonably careful corporate officer would have acted under the same or similar circumstances.

4850-9349-4824v4
KSHERMAN\22389003

81.     CODY knowingly acted against CMS's interests in connection with the acts alleged above.

82.     CODY had information relating to CMS that CODY knew or should have known was confidential. CODY used CMS's proprietary, trade secret, and confidential information for his own benefit and communicated CMS's proprietary, trade secret, and confidential information to SALT CREEK. CMS's proprietary, trade secret, and confidential information was not a matter of general knowledge.

83.     CMS did not give informed consent to CODY's conduct as alleged above.

84.     CMS has sustained, and will continue to sustain, actual damages in an amount to be proven at trial. CODY's conduct as alleged above was a substantial factor in causing CMS's harm.

85.     In performing the acts alleged above, CODY acted intentionally, fraudulently, and maliciously, and with the deliberate intent to injure CMS's business and improve his own business and that of SALT CREEK, and for financial gain, thereby warranting an award of exemplary damages in an amount appropriate to punish CODY and deter others from engaging in similar misconduct.

## SIXTH CAUSE OF ACTION

[Breach of Duty of Loyalty – against CODY, KELSOE, RICO, and BYRD]

86.     CMS realleges, and incorporates herein by reference, the allegations of paragraphs 1 through 85.

87.     As employees of CMS, CODY, KELSOE, RICO, and BYRD owed undivided duties of loyalty to CMS pursuant to California Labor Code, §§ 2850 *et seq.*

88.     Because of CODY, KELSOE, RICO, and BYRD's familiarity with CMS's Confidential Information and Invention Assignment Agreement and with the Handbook, CODY, KELSOE, RICO, and BYRD were aware of their duties to CMS.

89.     CODY, KELSOE, RICO, and BYRD knowingly acted against CMS's interests in connection with the acts alleged above.

90.     CMS did not give informed consent to the conduct of CODY, KELSOE, RICO, and BYRD as alleged above.

4850-9349-4824v4
KSHERMAN\22389003

91.     CMS has sustained, and will continue to sustain, actual damages in an amount to be determined according to proof. The conduct of CODY, KELSOE, RICO, and BYRD as alleged above was a substantial factor in causing CMS's harm.

92.     In performing the acts alleged above, CODY, KELSOE, RICO, and BYRD acted intentionally, fraudulently, and maliciously, and with the deliberate intent to injure CMS's business and improve their own business and that of SALT CREEK, and for financial gain, thereby warranting an award of exemplary damages in an amount appropriate to punish CODY, KELSOE, RICO, and BYRD and deter others from engaging in similar misconduct.

**SEVENTH CAUSE OF ACTION**

[Unfair Competition under Section 43(a) of the Lanham Act

(15 U.S.C. § 1125(a)) – against all Defendants]

93.     CMS realleges, and incorporates herein by reference, the allegations of paragraphs 1 through 92.

94.     By engaging in the acts alleged above, in particular, the marketing of SALT CREEK's "Purl System" product and SALT CREEK's "Vendor Relations Management System" product, Defendants have engaged in unfair competition. As the source code for those products belongs to CMS, Defendants' misrepresentation of those products as products of SALT CREEK constitutes false advertising. Moreover, Defendants' misrepresentation of those products as products of SALT CREEK is likely to create confusion in the marketplace. As CMS is engaged in interstate and foreign commerce, Defendants acts alleged above constitute violations of 15 U.S.C. § 1125(a).

95.     As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business practices and false advertising, CMS has lost money and property, and Defendants have enjoyed unlawful profits, in a sum not yet fully ascertained. CMS seeks actual damages and the disgorgement of profits obtained by Defendants as a result of their unlawful, unfair, and fraudulent business practices and false advertising, in an amount to be determined according to proof.

96.     As Defendants acted maliciously, fraudulently, deliberately, and willfully as alleged above, CMS is entitled to recovery of its attorneys' fees.

97.     CMS seeks preliminary and permanent injunctive relief to enjoin and restrain

4850-9349-4824v4
KSHERMAN\22389003

Defendants' conduct. Defendants' wrongful conduct will, unless and until enjoined and restrained by order of this Court, cause irreparable injury to CMS's business. Injunctive relief is also appropriate to restrain Defendants from further unlawful conduct for which Defendants have no adequate remedy at law.

## EIGHTH CAUSE OF ACTION

[Unfair Competition under Unfair Competition under

California Business & Professions Code §§ 17200 *et seq.* – against all Defendants]

98.     CMS realleges, and incorporates herein by reference, the allegations of paragraphs 1 through 97.

99.     By virtue of the misconduct alleged above, Defendants have engaged in unlawful, unfair, and fraudulent business practices and unfair, deceptive, untrue, and misleading advertising in violation of California Business and Professions Code sections 17200 *et seq.*

100.    As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business practices and unfair, deceptive, untrue, and misleading advertising, CMS has lost money and property, and Defendants have enjoyed unlawful profits, in a sum not yet fully ascertained. CMS seeks the disgorgement of illicit profits obtained by Defendants as a result of their unlawful, unfair, and fraudulent business practices and unfair, deceptive, untrue, and misleading advertising, as alleged above.

101.    CMS seeks preliminary and permanent injunctive relief to enjoin and restrain Defendants' conduct. Defendants' wrongful conduct will, unless and until enjoined and restrained by order of this Court, cause irreparable injury to CMS's business. Injunctive relief is also appropriate to restrain Defendants from further unlawful conduct for which Defendants have no adequate remedy at law.

## NINTH CAUSE OF ACTION

[Intentional Interference with Prospective Economic Relations – against all Defendants]

102.    CMS realleges, and incorporates herein by reference, the allegations of paragraphs 1 through 101.

103.    CMS has invested substantial capital and effort to develop and maintain its customer

4850-9349-4824v4
KSHERMAN\22389003

relationships.

104. CMS has ongoing business relationships with most of its customers, which constitute probable future economic benefit to CMS.

105. Defendants were fully aware of the economic benefit CMS derived from its business relationships with its customers.

106. By engaging in the conduct alleged above, Defendants intended to disrupt CMS's business relationships with its customers and/or knew that disruption of the relationships was certain or substantially certain to occur.

107. The business relationships with many of CMS's customers have been disrupted.

108. As a result of the disruption of the business relationship with its customers, CMS was harmed and has suffered actual damages in amount to be determined according to proof.

109. Defendants' conduct as alleged above was a substantial factor in causing CMS's harm.

110. In performing the acts alleged above, Defendants acted intentionally, fraudulently, and maliciously, and with the deliberate intent to injure CMS's business and improve their own business and for financial gain, thereby warranting an award of exemplary damages in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct.

## **TENTH CAUSE OF ACTION**

[Preliminary and Permanent Injunction and

Temporary Restraining Order – against all Defendants]

111. CMS realleges, and incorporates herein by reference, the allegations of paragraphs 1 through 110.

112. CMS is likely to succeed on the merits of its disputes with Defendants.

113. CMS has suffered and will continue to suffer immediate and irreparable harm if a temporary restraining order, preliminary injunction, and permanent injunction are not granted, to wit: loss of goodwill resulting in Defendants' interference with CMS's relationships with its customers, reputational harm resulting from Defendants' undercutting CMS's pricing, and the competitive advantage Defendants have enjoyed by removing the PURL SYSTEM 2.0 source code, vendor

4850-9349-4824v4
KSHERMAN\22389003

management source code, and other source code from CMS's source code repository and refusing to return it.

114.    The balance of equities strongly favors CMS. SALT CREEK has gained a considerable unfair competitive advantage over CMS by hiring the main programmers for CMS's PURL SYSTEM 2.0, by deleting the PURL SYSTEM 2.0 source code from CMS's source code repository, and by refusing to return that source code. It would take months, if not years, for CMS to start over in developing a new PURL SYSTEM 2.0 product and, in the meantime, Defendants are likely to have diverted all of CMS's customers. SALT CREEK also has gained a considerable unfair competitive advantage over CMS by unlawfully using CMS's proprietary, confidential, and trade secret customer information, including but not limited to customer identities, contact information, job characteristics, job status information, pricing, and customer-provided data, in order to solicit and divert CMS's customers.

115.    A temporary restraining order and preliminary and permanent injunctions are in the public interest because the public has a strong interest in stopping the violations of law alleged above.

## **PRAYER FOR RELIEF**

WHEREFORE, CMS prays for judgment and relief as follows:

1.    Injunctive relief temporarily, preliminarily, and permanently enjoining Defendants as follows:

    a.    CODY is ordered to immediately release the CMS phone number associated with a cell phone owned by CODY for transfer of that phone number to a CMS phone;

    b.    Defendants are ordered to restore all CMS source code, including the PURL SYSTEM 2.0 source code and the vendor management source code, to CMS's source code repository at GitHub, and to return full control of that source code repository to CMS;

    c.    Defendants, as well as each of their agents, and all persons acting in concert with any of them, are immediately restrained from, directly or indirectly, doing business with or soliciting any current or former CMS customer;

4850-9349-4824v4
KSHERMAN\22389003

1       d.  Defendants, as well as each of their agents, and all persons acting in concert with

2          any of them, are immediately restrained from, directly or indirectly, selling any

3          products or services using SALT CREEK's "Purl Systems" function, whether or

4          not the customer is a current or former CMS customer;

5       e.  Defendants, as well as each of their agents, and all persons acting in concert with

6          any of them, are immediately restrained from, directly or indirectly, selling any

7          products or services that is based on or derived from CMS's PURL SYSTEM 2.0

8          source code, whether or not the customer is a current or former CMS customer;

9       f.  Defendants, as well as each of their agents, and all persons acting in concert with

10      any of them, are immediately restrained from, directly or indirectly, selling any

11      products or services using SALT CREEK's "Vendor Relations Management

12      System" function, whether or not the customer is a current or former CMS

13      customer;

14     g.  Defendants, as well as each of their agents, and all persons acting in concert with

15      any of them, are immediately restrained from, directly or indirectly, selling any

16      products or services that is based on or derived from CMS's vendor management

17      source code, whether or not the customer is a current or former CMS customer;

18     h.  Defendants, as well as each of their agents, and all persons acting in concert with

19      any of them, are immediately restrained from, directly or indirectly, obtaining,

20      accessing, using, retaining, transmitting, disseminating, or disclosing to anyone,

21      any of CMS's confidential, proprietary, or trade secret information, including but

22      not limited to source code, customer identities, customer contact information,

23      customer job characteristics, customer job status information, customer pricing,

24      and customer-provided data; and

25     i.  Defendants, as well as each of their agents, and all persons acting in concert with

26      any of them, are immediately restrained from, directly or indirectly, engaging in

27      any activities related to the planning, design, or development of any personal

28      URL product, any vendor management system, or any other print and mail

4850-9349-4824v4
KSHERMAN\22389003

1      related product that in any way uses or discloses any of CMS's confidential,

2      proprietary, or trade secret information, including but not limited to source code,

3      customer identities, customer contact information, customer job characteristics,

4      customer job status information, customer pricing, or customer-provided data;

5     2.     Damages, past and future, in an amount sufficient to compensate CMS for the harm

6 done to it by Defendants;

7     3.     An accounting to establish, and an order requiring restitution and/or disgorgement of,

8 the sums by which Defendants have been unjustly enriched;

9     4.     Exemplary and punitive damages for Defendants' willful and malicious actions;

10     5.     Pre-judgment and post-judgment interest at the maximum rate allowed by law;

11     6.     Attorneys' fees and costs incurred by virtue of this action; and

12     7.     For such other and further relief as the Court may deem proper.

13

14 DATED: NOVEMBER 10, 2015      BERLINER COHEN, LLP

15

16      BY:   */S/ KATHLEEN F. SHERMAN*

     JONATHAN D. WOLF

17      SUSAN E. BISHOP

     KATHLEEN F. SHERMAN

18      ATTORNEYS FOR PLAINTIFF

     CAPITAL MAILING SERVICES, INC.

19

20      **DEMAND FOR JURY TRIAL**

21     Capital Mailing Services, Inc. hereby demands a trial by jury of all issues triable by a jury.

22 DATED: NOVEMBER 10, 2015      BERLINER COHEN, LLP

23

24      BY:   */S/ KATHLEEN F. SHERMAN*

     JONATHAN D. WOLF

25      SUSAN E. BISHOP

     KATHLEEN F. SHERMAN

26      ATTORNEYS FOR PLAINTIFF

     CAPITAL MAILING SERVICES, INC.

27

28 4850-9349-4824, v. 4

CASE NO. _____

COMPLAINT