UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

CAPITAL MAILING SERVICES, Inc., a
California corporation,

Plaintiff,

v.

SALT CREEK MEDIA, INC., et al.,

Defendants.

No.  2:15-cv-02337-TLN-CKD

**ORDER DENYING MOTION FOR
TEMPORARY RESTRAINING ORDER**

This matter is before the Court pursuant to Plaintiff Capital Mailing Services's ("CMS") Motion for Temporary Restraining Order.  (ECF No. 7.)  Defendants Salt Creek Media, Inc. ("Salt Creek") and Andrew Cody ("Cody") (collectively referred to as "Defendants") oppose Plaintiff's motion.  (ECF No 14.)  The Court has carefully considered the briefing presented by both parties, and for the reasons stated below hereby DENIES Plaintiff's motion.

I.    FACTUAL BACKGROUND

At the outset, the Court notes that the parties' versions of the facts in this matter differ quite drastically.  In fact, Cody is either separated or estranged from one of Plaintiff's current owners, Perice Sibley ("Perice").[1]  Both Cody and Perice's declarations contain allegations of

---

[1]    It appears that the rest of CMS's shares are owned by Perice's father who purchased them from Cody in 2009.

1

1   infidelity, spousal abuse, and animosity.  Perice asserts that Cody was let go from CMS due to

2   substance abuse and misuse of company funds, while Cody asserts that he was terminated after

3   ending their relationship and filing an action in family court.  Similarly, the declarations

4   presented by CMS's programmers contradict the declarations from Cody as well as Defendant

5   Matthew Kelsoe ("Kelsoe"), who is currently employed as a software programmer for Salt Creek.

6        CMS, which was founded in 2008 by Cody and his wife Perice Sibley, is in the business

7   of providing full-service print and mail services, and related marketing services. Cody was co-

8   founder, President, CEO, CFO, and Treasurer of CMS until he was terminated on September 8,

9   2015.  (TRO, ECF No. 7 at 4.)  Cody sold his stock in 2009 and has not had an ownership interest

10  in CMS since that date.  (TRO, ECF No. 7 at 4.)  Until mid-June 2015, when they resigned,

11  Defendants Kelsoe, Robert Rico ("Rico"), and Joshua Byrd ("Byrd") were computer

12  programmers employed by CMS.

13       According to Plaintiff, during the term of their employment, Kelsoe, Rico and Byrd

14  developed software for CMS, including but not limited to CMS's PURL SYSTEM 2.0 software

15  ("PURL 2.0") and CMS's vendor management software.  (TRO, ECF No. 7 at 4.)  The source

16  code for that software was stored in a GitHub source code organization repositories controlled by

17  Kelsoe.  (TRO, ECF No. 7 at 4.)  When Kelsoe resigned from CMS, he revoked the access to

18  those GitHub source code organization repositories of two programmers who remained in CMS's

19  employ.  (TRO, ECF No. 7 at 4.)  Two weeks later, following repeated CMS demands, Kelsoe

20  restored those two programmers' access to the GitHub source code organization repositories.

21  (TRO, ECF No. 7 at 4.)  However, by then, the source code for CMS's PURL SYSTEM 2.0

22  software and CMS's vendor management software, along with other source code, had been

23  removed from the repositories. (TRO, ECF No. 7 at 4.)  Despite repeated demands, Kelsoe

24  allegedly refused to return the missing source code, and CMS alleges that it has recently

25  discovered that he has made some of CMS's proprietary source code public.  (TRO, ECF No. 7 at

26  4.)

27       In contrast, both Kelsoe and Cody assert the GitHub account that PURL SYSTEMS was

28  stored on was Kelsoe's personal account that he had created many years prior to working for

2

CMS.  (Kelsoe Decl, ECF No. 16 at ¶ 7; Opp'n, ECF No. 14 at 6.)  Kelsoe states that when he first began to work at CMS, CMS employed a computer network manager who was "a disaster." (Kelsoe Decl, ECF No. 16 at ¶ 7.)  This person would maintain the computer network in an unorganized and unreliable fashion.  (Kelsoe Decl, ECF No. 16 at ¶ 7.)  For example, the network manager would suddenly re-purpose a server that hosted software being developed and delete CMS's files without notice.  (Kelsoe Decl, ECF No. 16 at ¶ 7.)  Therefore, Kelsoe approached Perice Sibley and told her about the unreliable manner in which the network was being maintained and stated that with this erratic behavior, much of the original sourcecode and software programs were in jeopardy of disappearing.  (Kelsoe Decl, ECF No. 16 at ¶ 7.)  Kelsoe told her that he had a GitHub account that could host much of the software and that it would be safe from the network manager and even computer crashes at CMS because the software would be stored in the computers of GitHub.  (Kelsoe Decl, ECF No. 16 at ¶ 7.)  He also told her that his account was free, which meant that the files he had in the account were "public."  (Kelsoe Decl, ECF No. 16 at ¶ 7.)  Essentially, this meant that anyone with internet access could access the files.  (Kelsoe Decl, ECF No. 16 at ¶ 7.)  GitHub offered a premium service for a monthly fee which allowed an account to become "private" thus not allowing public access.  (Kelsoe Decl, ECF No. 16 at ¶ 7.)  Perice stated that this sounded great and that Kelsoe should talk to the accounting department at CMS to have CMS pay for the premium service on his account. (Kelsoe Decl, ECF No. 16 at ¶ 7.)  Kelsoe states that at no time was there any discussion that his account was to become the property of CMS, instead CMS was paying for the perk of having a private account.  (Kelsoe Decl, ECF No. 16 at ¶ 7.)  Perice Sibley never asked Kelsoe to create another account, and it was always understood that the account belonged to him.  (Kelsoe Decl, ECF No. 16 at ¶ 7.)

Kelsoe states that after his account was upgraded to private, he migrated some of CMS's software to his Github account.  (Kelsoe Decl, ECF No. 16 at ¶ 8.)  During his employment at CMS, he worked on a number of software projects and stored the software being developed in his Github account.  (Kelsoe Decl, ECF No. 16 at ¶ 8.)  One such project was the development of what CMS refers to as PURL 2.0.  (Kelsoe Decl, ECF No. 16 at ¶ 8.)  Kelsoe states that all of the

3

software used to create PURL 2.0 was freely available opensource code software, meaning that it is in the public domain.  (Kelsoe Decl, ECF No. 16 at ¶ 8.)  Kelso asserts that when he left CMS, virtually no customization of the software had been performed: "PURL 2.0 was not even a working software program, instead it was an aggregation of plugins that were some of the programs we believed we needed when we started to customize it for CMS'[s] needs.  While CMS claims it has a copyright in PURL 2.0, I can state with a high degree of certainty that it was not an original work of authorship."  (Kelsoe Decl, ECF No. 16 at ¶ 8.)

Kelsoe states that when he decided to leave CMS, he pulled all of the Capital Mail Repositories off of his Github account onto the workstation he was provided with to make sure that CMS retained a copy of these repositories.  (Kelsoe Decl, ECF No. 16 at ¶ 12.)  A copy of these repositories was placed on the development server within Capital Mailing Services Server Room on "Blade 1."  (Kelsoe Decl, ECF No. 16 at ¶ 12.)  Kelsoe states that on or about June 12 through June 15, he changed the access codes such that CMS employees could no longer access his account and deleted CMS's software with the exception of 1CMS-Data Utilities, NewEst (a nonfunctional estimating project),"Rockets" (the original framework that the capital mailing job board was written on), Estimator (another nonfunctional estimating project), monsterpush (a utility that allows other systems to insert jobs into the capital mail job board), and 2Capital-Mailing-job-Board (the current job board for Capital Mailing Services).  (Kelsoe Decl, ECF No. 16 at ¶ 13.)  On the last day of his employment, he provided a copy of all of his passwords to the Network Manager Edgar Oliva and informed him and Mr. Shamber that he wanted to make sure that all of my access to the Capital Mail System was removed.  (Kelsoe Decl, ECF No. 16 at ¶ 14.)

In his declaration, Kelsoe states that he is not using CMS's software and further that this software is not copyrightable:

> I have friends who work at CMS and I have no interest in seeing CMS go out of business. I will willingly give my consent to an expert to review the activity in my GitHub account to confirm that no activity has taken place to copy, download, or access this program.
>
> Similarly, I will consent to CMS'[s] expert reviewing the activity in

4

> the GitHub account to confirm that CMS software was destroyed, pursuant to my employment agreements mandate that I not maintain CMS property, on or around the time I left CMS.
>
> The motion contains a lot of allegations about PURL software and the proprietary nature of PURL software. PURL software has been around for decades and there are numerous vendors that sell programs. In fact, PURL programs are relatively easy to write in a short amount of time.

(Kelsoe Decl, ECF No. 16 at ¶¶ 15, 17–18.)

Plaintiff alleges that in mid-September 2015, it became aware that Defendants were marketing a product that appeared to be substantially similar to PURL SYSTEM 2.0 and that Defendants could not have developed a similar product from scratch in three months.  (TRO, ECF No. 7 at 4.)  Plaintiff asserts that in early June 2015, Defendants began logging into CMS's customer database using their CMS logins from SALT CREEK's IP address.  (TRO, ECF No. 7 at 5.)  In addition, Plaintiff asserts that Cody arranged for CMS's customer service phone number to ring on his personal cell phone and that Cody has refused to relinquish that phone number to CMS.   (TRO, ECF No. 7 at 5.)  Plaintiff asserts that he has been soliciting and diverting CMS's customers when they call that phone number. (TRO, ECF No. 7 at 5.)  In addition, Plaintiff alleges that Cody diverted more than $300,000 from CMS's postal account and used those funds for his personal expenses.  (TRO, ECF No. 7 at 5.)  Plaintiff asserts:

> Because of Defendants' knowledge of CMS's pricing and because of Defendants' unlawful access to CMS's customer database, and Defendants' theft of CMS's source code and removal of that source code from CMS's source code repositories, Defendants have successfully diverted a substantial portion of CMS's business, with the result that CMS's very survival is at stake, threatening the livelihood of CMS's 160 employees, as well as critical services being provided to CMS's remaining customers, including several government agencies.

(TRO, ECF No. 7 at 5.)

Both Kelsoe and Cody have filed sworn declarations alleging that they are not using CMS's software.  (Cody Decl., ECF No. 15 at ¶ 4; Kelsoe Decl, ECF No. 16 at ¶ 15.)  Cody also states that even if Defendants had unlawfully used or taken PURL that it would not be crippling to CMS as Plaintiff asserts: "the revenue from CMS for providing PURL services amounts to less than .5% of its revenues as of the date I left CMS." (Cody Decl., ECF No. 15 at ¶ 3.)

5

1   Furthermore, Cody asserts that Salt Creek does not directly compete with CMS: "Salt Creek is a

2   software programming company.  CMS, unlike Salt Creek, is in the business of manufacturing

3   envelopes, printing and binding, and providing marketing content."  (Cody Decl., ECF No. 15 at

4   ¶ 3.)  Finally, Cody states that the phone number complained of is his own personal property that

5   he has owned since 1995 and that "[t]he number is, now, simply a tool that my ex-partner can use

6   to stifle my new business. The telephone number has been my only number for many years as I

7   use it for both personal and business reasons."  (Cody Decl., ECF No. 15 at ¶ 9.)

8          Plaintiff asserts ten causes of action against Defendants, including: copyright

9   infringement; misappropriation of trade secrets; violation of the Computer Fraud and Abuse Act;

10  breach of contract; breach of fiduciary duty, breach of duty of loyalty; unfair competition under

11  the Lanham Act; unfair competition under California Business and Professional Code; and

12  intentional interference with prospective economic relations.  (Compl. ECF No. 1.)

13         **II.     LEGAL STANDARD**

14         A temporary restraining order is an extraordinary and temporary "fix" that the court may

15  issue without notice to the adverse party if, in an affidavit or verified complaint, the movant

16  "clearly show[s] that immediate and irreparable injury, loss, or damage will result to the movant

17  before the adverse party can be heard in opposition."  Fed. R. Civ. P. 65(b)(1)(A).  The purpose

18  of a temporary restraining order is to preserve the status quo pending a fuller hearing.  *See* Fed. R.

19  Civ. P. 65.  It is the practice of this district to construe a motion for temporary restraining order as

20  a motion for preliminary injunction.  Local Rule 231(a); *see also Aiello v. One West Bank*, No.

21  2:10–cv–0227–GEB–EFB, 2010 WL 406092 at *1 (E.D. Cal. Jan. 29, 2010) ("Temporary

22  restraining orders are governed by the same standard applicable to preliminary injunctions.")

23  (internal quotation and citations omitted).

24         Therefore, the party requesting injunctive relief must show that "he is likely to succeed on

25  the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

26  balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v.*

27  *Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).  Although pro se pleadings are liberally

28  construed, *see Haines v. Kerner*, 404 U.S. 519, 520–21 (1972), they are not immune from the

6

1    Federal Rules of Civil Procedure.  *See Ghazali v. Moran*, 46 F.3d 52, 53–54 (9th Cir. 1995).  The

2    propriety of a request for injunctive relief hinges on a significant threat of irreparable injury that

3    must be imminent in nature.  *Caribbean Marine Serv. Co. v. Baldridge*, 844 F.2d 668, 674 (9th

4    Cir. 1988).

5         Alternatively, under the so-called sliding scale approach, as long as the plaintiff

6    demonstrates the requisite likelihood of irreparable harm and can show that an injunction is in the

7    public interest, a preliminary injunction may issue so long as serious questions going to the merits

8    of the case are raised and the balance of hardships tips sharply in plaintiff's favor.  *Alliance for*

9    *Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–36 (9th Cir. 2011) (concluding that the "serious

10   questions" version of the sliding scale test for preliminary injunctions remains viable after

11   *Winter*).

12        **III.    ANALYSIS**

13        A temporary restraining order is an extraordinary remedy that requires the moving party to

14   show that the factors weigh in favor of granting relief.  Fed. R. Civ. P. 65(b)(1)(A).  The Court

15   addresses each requirement in turn.

16        A.  Likelihood of Success on the Merits

17        In addressing the first factor, likelihood of success on the merits, the Court cannot find

18   that Plaintiff has shown a likelihood of success because all the material facts are at issue.  This

19   case is a text book example of he-said-she-said behavior.   The contradictions within the sworn

20   declarations before this Court do not impart confidence in either party's version of the facts.  This

21   is especially true where Plaintiff is requesting that this Court enjoin Defendants and award

22   $300,000 to Plaintiff, instead of asking the Court to maintain the status quo.  *See Schrier v.*

23   *University of Co.*, 427 F.3d 1253, 1259 (10th Cir. 2005) (holding that in cases where the movant

24   seeks to alter the status quo, preliminary injunction is disfavored and a higher level of scrutiny

25   must apply.)

26        For example, the Court is not convinced that Defendants have been using their software

27   and infringing on copyrighted material.  The crux of Plaintiff's motion is that Salt Creek must

28   have utilized Plaintiff's proprietary software because soon after Salt Creek formed it began

marketing its services for providing vendor management software services.  However, the Court is in receipt of two sworn declarations from Defendants which state that Salt Creek is not using CMS's PURL 2.0.  (Cody Decl., ECF No. 15 at ¶ 4; Kelsoe Decl, ECF No. 16 at ¶ 15.)  Furthermore, Cody has stated that for over one month he and his counsel have been offering CMS an opportunity to have its programmers take a look at Salt Creek's software and either have CMS's attorneys or a neutral third party run a comparison of Salt Creek's software and CMS's software.  (Opp'n, ECF No. 14 at 4; Cody Decl., ECF No. 15 at ¶ 8.)  CMS has allegedly not taken Cody up on this offer which makes this Court question the validity of Plaintiff's legal claims against Defendants, as well as whether Plaintiff is likely to suffer irreparable harm.

Similarly, a large portion of Plaintiff's claims involve the alleged theft of purported proprietary software when Kelsoe cut off access to his Github account after he left CMS.  Again, the Court is in receipt of two different, plausible versions of how this situation unfolded.  Furthermore, in his declaration, Kelsoe agrees to stipulate and sign a consent to CMS obtaining directly from GitHub any information it may have establishing the dates on which CMS's files were deleted from his account.  (Kelsoe Decl, ECF No. 16 at ¶ 15.)   Quite frankly, Plaintiff has the burden of showing that they are likely to succeed on the merits of their case, and it has not met its burden.  Thus, this factor weighs in favor of denying Plaintiff's motion.

B.  Irreparable Harm

Plaintiff alleges that they will suffer irreparable harm if they are not awarded injunctive relief.  (TRO, ECF No. 7 at 16.)  However, Defendants assert that the fact that Plaintiff waited almost six months after the alleged wrongful behavior to file for injunctive relief is indicative of a lack of imminent and irreparable injury.  (Opp'n, ECF No. 14 at 3.)  This Court agrees.

Local Rule 231(b), which governs motions for temporary restraining orders states:

> In considering a motion for a temporary restraining order, the Court will consider whether the applicant could have sought relief by motion for preliminary injunction at an earlier date without the necessity for seeking last-minute relief by motion for temporary restraining order. Should the Court find that the applicant unduly delayed in seeking injunctive relief, the Court may conclude that the delay constitutes laches or contradicts the applicant's allegations of irreparable injury and may deny the motion solely on either ground.

1    All of the acts in this case happened in June 2015, and Plaintiff stated that they were aware that

2    they were locked out of GitHub immediately upon Kelsoe's departure from the company. (TRO,

3    ECF No. 7 at 6.) However, Plaintiff alleges that there were purportedly a series of intrusions and

4    wrongful acts since June 2015. This Court is not convinced that a party facing the sort of

5    irreparable harm alleged by Plaintiff would wait five to six months to seek injunctive relief in

6    order to complete discovery. Moreover, CMS has allegedly had the opportunity to access Salt

7    Creek's software and has failed to do so. These factors do not support a finding of irreparable

8    harm. As such, this factor weighs against granting Plaintiff's motion for injunctive relief.

9         C. <u>Balance of the Inequities</u>

10       Plaintiff asserts that the balance of equities weighs in favor of granting Plaintiff's motion

11    because "[i]f Defendants are enjoined as requested, they will not be prevented from continuing to

12    conduct their legitimate business. They will only be prevented from continuing to enjoy the fruits

13    of CMS's labor to their own benefit." (TRO, ECF No. 7 at 17.) The Court agrees that if

14    Defendants have acted as Plaintiff alleges, such would be the case. However, the Court is not

15    convinced that Plaintiff's factual assertions are accurate. It is unclear if the software Defendants

16    are using is in fact derivative of Plaintiff's copyrightable property. Moreover, Plaintiff is not only

17    asking this Court to enjoin Defendants, but is also asking that this Court order Defendants to pay

18    Plaintiff $300,000 as partial restitution for the amounts diverted from CMS's postal account and

19    used for Cody's personal expenses. (TRO, ECF No. 7 at 2.) Plaintiff asks for extraordinary relief

20    without proof that said amount is owed. Therefore, this factor at the very least can be said to be

21    neutral. This Court cannot in good faith find that this factor weighs in favor of granting relief

22    based on the information before the Court.

23         D. <u>Public Interest</u>

24       Lastly, Plaintiff asserts that the public interest weighs in favor of granting relief.

25    Plaintiff's entire argument on this point is limited to the following: "The potential loss of 160

26    jobs and the potential impact on three California state agencies implicate a strong interest by the

27    public in granting the requested relief. In addition, there are 'generalized public policy interests

28    in seeing legitimate contracts enforced and preventing copyright infringement.'" (TRO, ECF No.

7 at 18 (internal citations omitted).)  The Court finds that the loss of potential jobs and impact on government agencies would, if established, support an award of injunctive relief.  However, as addressed previously in this order, Plaintiff has not met its burden of substantiating the merit of its legal claims.  Nor has Plaintiff explained how any government agency is affected in this matter.  Thus, this factor cannot salvage Plaintiff's failure to show a likelihood of success or a likelihood of irreparable harm.

## IV.   CONCLUSION

For the reasons set forth above, the Court finds that the *Winter* factors do not weigh in favor of awarding Plaintiff's request for injunctive relief.  Plaintiff simply has not met its burden in obtaining a temporary restraining order.  Accordingly, Plaintiff's Motion for Temporary Restraining Order (ECF No. 7) is hereby DENIED.

IT IS SO ORDERED.

Dated:  November 25, 2015

Troy L. Nunley
United States District Judge